WOODWARD & LOTHROP, INC., Plaintiff,

v.

Robert V. SCHNABEL, et al., Defendants.

Margaret C. DUDLEY, et al., Plaintiffs,

v.

Edwin K. HOFFMAN, et al., Defendants.

Jo V. SEIBERT, Plaintiff,

v.

Edwin K. HOFFMAN, et al., Defendants.

Barnett STEPAK, Plaintiff,

v.

Edwin K. HOFFMAN, et al., Defendants.

Civ. A. Nos. 84–1716, 84–2028, 84–2051 and 84–2102.

United States District Court, District of Columbia.

July 26, 1984.

On Motion for Preliminary Injunction Sept. 10, 1984.

Peggy Kerr, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for plaintiff in No. 84–1716.

Calvin Cobb, Jr., Kenneth Johnson, Steptoe & Johnson, Washington, D.C., for defendants in No. 84–1716 and for plaintiffs in No. 84–2028.

John T. Kotelly, Dickstein, Shapiro & Morin, Margaret K. Pfeiffer, Sullivan & Cromwell, Reed E. Hundt, Irwin Goldbloom, Latham, Watkins & Hills, Larraine S. Holbrooke, Gibson, Dunn & Crutcher, Washington, D.C., for defendants in Nos. 84–2028, 84–2051 and 84–2102.

Michael I. Smith, Harvey A. Levin, Freedman, Levy, Kroll & Simonds, Washington, D.C., for plaintiff in No. 84–2051.

Gene A. Bechtel, Bechtel & Cole, Washington, D.C., for plaintiff in No. 84–2102.

## TEMPORARY RESTRAINING ORDER

JOYCE HENS GREEN, District Judge.

Before the Court is plaintiffs' motion for a preliminary injunction in *Dudley, et al. v. Hoffman, et al.* ("Dudley"), C.A. No. 84–2028, · which motion, at the suggestion of the Court and by agreement of the parties, shall be treated as a motion for a temporary restraining order.[1] The *Dudley* action has been consolidated for all purposes with *Woodward & Lothrop, Inc. v. Schnabel, et al.* ("Schnabel"), C.A. No. 84–1716, and *Seibert v. Hoffman, et al.* ("Seibert"), C.A. No. 84–2051, and those actions have been consolidated for purposes of this motion with *Stepak v. Hoffman, et al.* ("Stepak"), C.A. No. 84–2102. Each of these cases arises from the parties' activities in connection with a proposed merger between Woodward and Lothrop, Inc. ("W & L") and defendants Taubman, Taubman Holdings, Inc. ("THI") and/or Taubman Acqui-

---

1. The parties have further agreed that their papers submitted in support of and in opposition to plaintiffs' motion for a preliminary injunction shall be construed as applicable to motions seeking both a temporary restraining order and a preliminary injunction.

sitions ("TDC"). The merger proposal is scheduled to be presented to W & L shareholders for approval at a special stockholders' meeting to be held on July 31, 1984, and the *Dudley, Seibert* and *Stepak* plaintiffs (hereinafter plaintiffs or Dudley) now seek to postpone the shareholders' vote on the merger pending correction of allegedly false or misleading statements contained in the company's proxy materials mailed to shareholders and allegedly violative of Section 14(a) of the Securities Exchange Act of 1934 ("the 1934 Act"), 15 U.S.C. § 78n(a) (1982) ("Section 14(a)").

Although plaintiffs' complaints raise numerous federal and state law claims, the motion for temporary injunctive relief now before the Court focuses only on plaintiffs' claims under Section 14(a) of the 1934 Act.

Woodward and Lothrop is a publicly owned corporation which is engaged primarily in the retail merchandising business. Founded in 1880 as a partnership and incorporated in the District of Columbia in 1906, Woodward and Lothrop operates a chain of seventeen stores in the Washington/Baltimore metropolitan area and also maintains service units incidental to the operation of its stores. Its assets include holdings in fee of fifteen of the properties on which it conducts business and leaseholds for seven other stores. The company also owns the building for one of its stores while holding a ground lease for the underlying land.

It is undisputed that the authorized capital stock of the company is 6,018,672 shares of which 6,000,000 shares are common stock and the remainder are preferred stock. On June 1, 1984 the company redeemed all of its outstanding preferred stock. As of June 21, 1984, the record date utilized for purposes of proxy solicitation, there were 3,749,512 shares of common stock outstanding and publicly traded by approximately 3600 shareholders.

### BACKGROUND OF THE MERGER PROPOSAL

In late 1983, Ronald S. Baron, a New York broker/dealer and investment advisor, approached defendant Hoffman, W &

L's Chairman of the Board and Chief Executive Officer, to discuss a leveraged buyout of W & L at $60 per share. No formal proposal was made at that time, and the company did not pursue further discussion with Baron. On February 17, 1984, W & L commenced an injunctive action in this Court against Baron, *Woodward & Lothrop, Inc. v. Baron*, C.A. No. 84–0513, alleging that the defendants in that action were assembling a control block of W & L common stock with the intention of selling the stock at a premium either to W & L or to a potential buyer of the company, without making required disclosures under Section 13(d) of the 1934 Act. The complaint also alleged violations of Section 10(b) of the 1934 Act and the District of Columbia common law of fraud. That action was settled and dismissed with prejudice on July 25, 1984.

Against the backdrop of the *Baron* activity, and amidst concerns that W & L might be faced with a hostile takeover bid, the company's Board of Directors held an informal meeting on March 30, 1984, at which the senior management directors, defendants Hoffman, Mulligan and Mullen, discussed with the other directors the possibility of seeking a purchaser for W & L. The consensus of the group was that the company should seek a purchaser, and to that end members of management met the next day with defendant Taubman and his associates to discuss a possible merger or acquisition. During the month of April, meetings were held among Taubman's representatives, W & L, counsel for W & L, and defendant Goldman, Sachs & Co. (W & L's investment advisor). On April 30, 1984 Taubman and W & L executed a merger agreement, pursuant to which (subject to the approval of the holders of two-thirds of W & L's outstanding shares of common stock) Taubman, through defendants THI and TDC, would acquire W & L in a merger transaction for $220 million. Under the merger agreement, TDC and W & L would merge into a single corporation, and THI would own the equity interest in that surviving corporation.

W & L's shareholders would receive $59 in cash for each share of common stock they held, and pursuant to District of Columbia law, the shareholders would have the right to dissent from the merger and receive fair value for their shares.

The Taubman merger proposal provided that if the merger agreement were consummated, Hoffman, Mulligan and Mullen would receive stock options to acquire 20%, collectively, of the equity in THI for $5 million. The options would vest at the rate of 20% annually and are exercisable for ten years. THI also agreed to provide the senior management directors with stock appreciation rights constituting a right to receive in cash, upon the exercise of an option, the amount by which the stock's fair market value exceeds the option price (less required withholdings). In addition, the senior management directors would receive dividend equivalency rights whereby, in the event THI should declare a dividend on its then outstanding common stock, each optionee would be paid in cash, less required withholdings, an amount equal to the dividend that would have been paid had the optionee then owned shares subject to vested options.

Also on April 30, Taubman and W & L executed a stock purchase agreement giving THI an option to purchase approximately 32% of W & L's common stock at $59 per share, the effect of which is to enable the Taubman interests to block competitive offers for W & L. The merger agreement was conditioned upon approval of the stock purchase agreement, which provided that Taubman's option would be exercisable in whole or in part before January 1, 1985 or until termination of the merger agreement by written mutual consent of the parties, whichever should occur earlier. Absent approval by the shareholders, the merger agreement dissolves on September 30, 1984.

The Taubman merger proposal (including the stock purchase agreement) was presented to the nonmanagement directors at 10:00 a.m. on April 30, 1984 and remained open until 5:00 p.m. on that same day. The nonmanagement directors considered the proposal as well as the advice of defendant Goldman, Sachs that the $59 price per share offered by Taubman was in the high range of fairness to the stockholders. After approximately two hours of deliberation, the Board voted to approve the merger and stock purchase agreement. Defendants Hoffman, Mulligan and Mullen did not participate in that vote.

## COMMUNICATIONS TO SHAREHOLDERS

Immediately after the Board meeting, on April 30, 1984, W & L and THI, with the authorization of the W & L Board, issued a press release regarding the merger. The press release included, among other things, the following quote from Hoffman:

This merger, when approved, will provide our stockholders a significant premium for their investment in the company while at the same time providing the stability and continuity needed to maintain Woodward & Lothrop as Washington's premier retail establishment.

W & L mailed a copy of the April 30 press release to each of its shareholders.

In early May, 1984, a group of shareholders descended from the founders of W & L and holding approximately 14.99% of the company's stock formed the "Woodward and Lothrop Shareholders' Protective Committee" ("Shareholders' Committee") and executed an agreement stating the following objectives:

(a) To evaluate the proposal by Taubman Holdings, Inc. to acquire all the Shares of Woodward & Lothrop at a price of $59 per share pursuant to an Agreement and Plan of Merger dated as of April 30, 1984 and/or any amendments or modifications thereof (the "Taubman Proposal");

(b) To consider whether to support or oppose the approval of the Taubman Proposal and whether to solicit proxies of other shareholders of Woodward & Lothrop to vote in favor of or to vote against the Taubman Proposal;

(c) To consider whether to seek other proposals for the acquisition of all or part of the Shares of Woodward & Lothrop or the merger, sale, or other consolidation of Woodward & Lothrop and whether to solicit proxies of other shareholders of Woodward & Lothrop to vote in favor of or against such other proposals;

(d) To consider the need for possible litigation as may be deemed necessary or appropriate; and

(e) To obtain the best possible result for the Participating Shareholders.

That agreement was disseminated to shareholders of the company.

On May 30, 1984, a group of six Committee members apparently authorized by the Committee filed an action in the District of Columbia Superior Court against W & L, the senior management directors, and the Taubman interests. *Melville Church III, et al. v. Edwin K. Hoffman, et al.* ("Church"), C.A. No. 6672–84. The *Church* plaintiffs sought to enjoin defendants in that action from taking any steps to accomplish or implement the proposed merger, on the grounds that the $59 per share price was unfair and inadequate and that the benefits offered as inducements to senior management directors were excessive. Shortly thereafter, on June 4, 1984, W & L filed the *Schnabel* complaint in this Court, naming as defendants the six *Church* plaintiffs and others alleged to be members of the Shareholders' Committee. In that action, the company alleged violations of Sections 14(a) and 13(d) of the 1934 Act in connection with the formation of the Shareholders' Committee and sought relief including invalidation of the shareholders' agreement and an injunction prohibiting defendants in that action from soliciting proxies with respect to W & L securities. Contemporaneous with the filing of that complaint, the Board again issued a press release, announcing its action, reaffirming its support of the merger proposal, and stat-

ing that the $59 price per share was "fair" and "in the best interests of the Company and all of its shareholders."

W & L's Board met on or about June 26 and established a Special Committee to review the Shareholder Committee's demand for reconsideration of the proposed merger, to investigate that Committee's allegations, to take action with respect to that demand and to determine what action, if any, should be taken by W & L with respect to the litigation. Evidence from all parties and their advisors has been presented to the Board's Special Committee.[2]

On June 28, W & L disseminated to its shareholders a formal proxy solicitation urging approval of the Taubman merger proposal and summarizing key terms of the proposal, including benefits to the senior management directors. The proxy statement also described the stock purchase agreement (which was not subject to a shareholder vote) and provided extensive information about the value of W & L's assets. A special meeting of shareholders was therein scheduled for thirty-three days later, that is, for July 31, 1984, to vote on the agreement and merger plan.

On July 2, 1984, a group of seven plaintiffs, six of whom were *Schnabel* defendants and *Church* plaintiffs, filed the *Dudley* complaint against W & L, the entire Board of Directors, the Taubman interests and Goldman, Sachs. The *Dudley* plaintiffs alleged violations of Section 14(a) in connection with the issuance of the April 30 and June 4 press releases and the dissemination of the formal proxy solicitation. While asserting multiple deficiencies in the proxy statement, they emphasized their essential allegations that the proxy statement contained false and misleading statements or omissions in that it failed to disclose the fair market value of W & L's real estate and other assets, failed to disclose the extent of the management directors' interest in the merger, failed to disclose W & L's true motivations in discouraging Baron's

**2.** According to W & L's announcement to its shareholders, the report of the Special Committee is "expected to be available Friday, July 27."

interest in W & L, failed to disclose the "lockup" effect of Taubman's stock purchase option, and failed to fully disclose the Board's reasons for approving the Taubman merger. The *Dudley* complaint also raised state law claims identical to claims pending in the *Church* action based on alleged breach of fiduciary duty, corporate waste, inducement of breach of a fiduciary duty (against the Taubman interests) and negligence in rendering advice (against Goldman, Sachs). The complaint also included a claim under Section 13(e) of the 1934 Act.

The Superior Court scheduled a preliminary injunction hearing for July 19, 1984[3] which would have resolved, at least in part, the pendent claims before this Court.

Meanwhile, both the company and the Committee continued to contact shareholders regarding the merger proposal and the value of the company. In a letter and proxy supplementation dated July 9, 1984, defendant Hoffman generally urged approval of the merger agreement and attempted to clarify the basis of the company's real estate appraisal figures. Specifically, Hoffman stated:

> The independent real estate experts who analyzed our properties on behalf of the Company in 1984 did not consider the *liquidation* value of the real estate— that is, the price which might be obtained if the land and buildings were to be sold for use by a third party. This decision to value the continuing "going business" of the Company was made because we believe your Company is worth more alive than dead. We do not consider the liquidation of the Company or the sale of its properties to anyone as a viable alternative...."

On July 12, 1984 the Shareholders' Committee mailed materials to shareholders urging rejection of the proposed merger and stating that, based upon independent real estate appraisals, W & L's real estate hold-

ings alone were valued at least $290 million, more than the amount offered by Taubman for all of W & L's assets. Within a week, the Committee mailed a second set of materials to the shareholders acknowledging that the $290 million figure was inaccurate but asserting that the appraised value of W & L's real estate is at least $276 million, a figure also well over the $220 million Taubman offer, and possibly as much as $310 million.

On July 18, 1984 W & L again encouraged approval of the merger in another letter to the shareholders from defendant Hoffman. In particular, the July 18 letter noted that no other offers had been received by W & L and that the Shareholders' Committee had not presented a competing offer. Most recently, on July 23, 1984, W & L mailed a letter in the form of a brochure to the shareholders from Hoffman, disputing the Committee's appraisal of W & L's real estate and claiming to "set the record straight". Included with the brochure was a second supplementation of the proxy statement, apprising shareholders of the status of litigation concerning the merger proposal. The three submissions of the July 23 mailing recited the claims alleged in *Dudley*, *Seibert*, and *Stepak*[4], informed the shareholders that on that same day the *Church* action in Superior Court had been dismissed, and notified the shareholders of the anticipated July 27 report of the Special Committee.

## PRESENT POSTURE OF THIS ACTION

In light of the July 23 dismissal of the *Church* complaint in Superior Court and simultaneous cancellation of the scheduled hearing in that forum, the *Dudley* plaintiffs requested injunctive relief in this Court. The matter was heard as an application for a temporary restraining order on July 25, 1984. The sole issue addressed at the hearing, and the sole focus of the following discussion are plaintiffs' claims under Section 14(a) of the 1934 Act.

---

**3.** That hearing was subsequently delayed twice and was finally cancelled, as will be discussed below.

**4.** The latter two actions were filed on July 9, 1984 and July 13, 1984, respectively, and raise essentially the same claims addressed in *Dudley*.

## DISCUSSION

Seeking temporary injunctive relief, plaintiffs contend that all of defendants' communications to W & L shareholders regarding the merger, including the April 30, 1984 and June 4, 1984 press releases, the June 28, 1984 formal proxy statement, and subsequent letters and proxy supplementations sent to the shareholders were materially false or misleading in violation of SEC Rule 14a-9. In pertinent part, SEC Rule 14a–9 provides that:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9 (1983). Plaintiffs claim that a vote on the merger in this climate, in reliance on the defendants' allegedly false and misleading proxy materials, would be irreparably tainted.

The W & L defendants respond that the April 30 and June 4 press releases were mere informational communications not subject to the SEC rules governing proxy solicitation. With respect to subsequent communications, conceded to be proxy materials, defendants assert that they have fulfilled their obligations under Rule 14a–9 and that, although the parties give differing interpretations to those materials, plaintiffs have not identified any material objective fact not contained in defendants' proxy materials. Moreover, the W & L defendants insist that even if misleading statements were disseminated to the shareholders, the effect of the controversy between the parties has been to fully ventilate all issues and to apprise the shareholders of the advantages and disadvantages of the merger. Under such circumstances, defendants contend, a temporary injunction aimed at "curing" misinformation would be inappropriate.

■ To succeed upon their motion for temporary injunctive relief, plaintiffs must demonstrate (1) a substantial showing of likelihood that they will prevail on the merits, (2) that without the requested relief they will suffer irreparable injury, (3) that issuance of an injunction would not substantially harm other parties, and (4) that the public interest favors issuing the injunction. *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841 (D.C.Cir.1977); *see also Virginia Petroleum Jobbers Association v. FPC,* 259 F.2d 921 (D.C.Cir.1958). If the last three factors strongly support plaintiffs' motion, the Court may issue an injunction if plaintiffs have made a "substantial case on the merits." *Brink's, Inc. v. Bd. of Governors of the Federal Reserve System,* 466 F.Supp. 112, 115 (D.D.C.1979).

We turn first to the merits. At the outset, no need exists to determine whether the 1984 press releases of April and June constituted proxy materials within the meaning of Section 14(a). The essence of those communications—the company's assurance that Taubman's offer was fair and in the best interests of the shareholders—has been reiterated time and again, and indeed amplified and clarified in subsequent materials indisputably governed by Section 14(a). The critical issue on this motion is the timely dissemination of quality information contained in those later materials, measured by the standard of Rule 14a-9.

■ SEC Rule 14a–9 prohibits the making of any false or misleading statements or omissions in proxy solicitations. The purpose of the provision is to insure that shareholders are provided with complete, truthful and accurate information before deciding whether to grant, withhold or revoke a proxy. *Cf. SEC v. Falstaff Brewing Corp.,* 629 F.2d 62 (D.C.Cir.1980), *cert. denied sub nom., Kalmanovitz v. SEC,*

449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980). The Supreme Court has defined the standard of materiality under Rule 14a–9 as follows:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).

The W & L defendants argue that the "total mix" of information disseminated to W & L shareholders includes not only the company's proxy materials but also the plaintiffs' mailings to the shareholders, which essentially concern the propriety and projected value of benefits to the senior managers and the fairness of Taubman's offer. Through those total communications, W & L claims, the requirements of Rule 14a–9 have been satisfied by full exposure of the divergent views: not only W & L's advocated position but also the challenges of the Shareholders' Committee have been thereby communicated to those who will cast a vote for or against the merger.

The "total mix" package offered by the W & L defendants as the answer to plaintiffs' challenges may, eventually, be the appropriate conduit to the reasoned and considered decision of the shareholder on the merger question.

But, it is indisputable that an integral part of that package, the latest three submissions, all of July 23, 1984, mailed to the shareholders on that date will reach some of the shareholders only on July 25 (six days prior to the meeting) and the rest of the shareholders as late as July 30, 1984 (*one* day, or mere hours) before the crucial meeting.

■ The concept of full and fair disclosure under Rule 14a–9 cannot exclude an element of timeliness: not only the substance of the information but the timing of dissemination, its availability, must be considered. Well aware of the importance of timing, weeks ago W & L established its schedule for disseminating information to the shareholders. Designating a June 21, 1984 record date for the vote, W & L sent its shareholders a June 28 proxy statement in contemplation of a July 31 meeting, to afford the shareholders ample time (33 days) to consider, with reasoned deliberation, the important choice they would make for or against the proposed merger.

Subsequently, challenged by litigation, W & L issued a July 9 proxy supplement containing information to be read in conjunction with the first. Like the first proxy statement, that supplement, and the Hoffman letter bearing the same date, were disseminated well before the scheduled meeting—in that instance, with 22 days remaining. The challenges persisted, and perceiving a need to further respond to the Shareholders' Committee, to explicate the company's position, to disclose in full all allegations against the company—in short, to provide material facts bearing on the impending vote—W & L prepared a second proxy supplementation and informational brochure. Not mailed until July 23, the materials are expected to reach those whose shares are held in "street name" only one day prior to the July 31 meeting. The contents of the July 23 communications, including the recitation of challenges to the company's position and factual data explaining the disparity between real estate appraisals prepared on behalf of both parties, are an essential component of the "mix" of information. The shareholders must have an opportunity to make their considered decision in the illumination of this disclosure.

■ The parties have produced experts of singular qualification. The affidavits and testimony adduced at the hearing, while reflective of the parties' disparate positions, serve also to highlight the conclusion that the expert "papering" in this re-

gard could continue indefinitely. At this juncture, what transcends even a resolution of that polarization is that the shareholders must have before them the material facts of the proposed merger and its implication to them. By W & L's selection of the timing, the shareholders (many of whom vote their proxies by mail) have been deprived of a reasonable opportunity to receive, much less digest and analyze, the substance of the allegations against W & L or to consider whatever facts support W & L's assertion that the Shareholders' Committee has overstated the value of the company's real estate holdings. The materiality of that information cannot be doubted: there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *See TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. at 449, 96 S.Ct. at 2132 (1976). Furthermore, given the tardiness of the mailing, it must be considered "omitted" from the "total mix of information" placed before the shareholders *at the present time.* Under these circumstances, and for purpose of the temporary injunctive relief sought, the Shareholders' Committee has made a substantial showing that, *at this time* W & L has not complied with the requirements of Rule 14a–9.

Plaintiffs have also shown that they will suffer irreparable injury if a temporary restraining order does not issue. Absent an injunction, the Taubman proposal will be placed before the shareholders for a vote on July 31, 1984. The W & L defendants have represented that consummation of the merger could be accomplished as soon as a day after the vote. Given the current state of information now before the shareholders, proceeding with the vote would itself cause an irreparable injury to the shareholders who would be compelled to make a vital investment decision based on incomplete and potentially materially misleading information, *see Riggs National Bank v. Allbritton,* 516 F.Supp. 164, 181 (D.D.C. 1981). As the Supreme Court stated in *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970):

[Section 14(a)] was intended to promote 'the free exercise of the voting rights of stockholders' by ensuring that proxies would be solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'

*Id.* at 381, 90 S.Ct. at 620 (citations omitted). That purpose is trivialized if the stockholder's right to cast an informed vote is considered to be worth only the price of his stock should he opt to dissent from the merger. Furthermore, there are the practical difficulties posed by rescission of a consummated merger. For instance, the newly-formed surviving corporation might well sell major assets, enter binding agreements and take other actions, the impact of which could be difficult to undo. Post-consummation relief from the consequences of a premature and uninformed vote would be inadequate. *Denison Mines Limited v. Fibreboard Corp.,* 388 F.Supp. 812, 828 (D.Del. 1974) ("Where the transaction is a merger ..., divestiture may well turn out to be an unfeasible remedy ....")

The balance of harm here also favors maintenance of the status quo through the issuance of an injunction. The Taubman offer remains open through the end of September, 1984, and the detriment to the W & L defendants or the Taubman interests resulting from rescheduling the merger vote within that period is speculative at best. It is conceivable that W & L may, at some expense, be compelled to resolicit proxies (depending upon the date of the rescheduled vote) but that possibility does not amount to such substantial harm as would outweigh the benefits of a considered vote on the merger, which can only occur in the receipt of material information. It is similarly speculative that issuance of an injunction will somehow prejudice the voters against the company. In any event, the danger cannot be said to be substantial. Furthermore, third parties, including the Taubman interests and the shareholders, although inconvenienced, will not suffer substantial harm by rescheduling of the July 31 meeting date.

■ Lastly, issuance of a temporary restraining order to enjoin the merger vote would serve the public interest. In enacting Section 14 of the 1934 Act, Congress sought to reflect a strong public interest favoring fair and informed exercise of shareholder democracy. "[Section 14(a)] stemmed from a congressional belief that '[f]air corporate sufferage is an important right that should attach to every equity security bought on a public exchange'", *Mills v. Electric Auto-Lite Co.*, 396 U.S. at 381, 90 S.Ct. at 620 (citations omitted). That vital interest underlying Section 14 would be served by a stay of the vote until the shareholders receive and digest all material reflecting both parties' positions disseminated to them by W & L. Without material, accurate and complete information essential to a responsible vote on the merger question, the integrity of shareholder democracy cannot be vindicated.

It must be emphasized that this temporary restraining order is not an instance of substituting the judgment of the Court for the corporate business judgment, which may ultimately prevail. It is instead a matter of granting extraordinary relief in circumstances that justify that relief to provide to those most vitally affected the rights of full and fair disclosure as mandated by law. As our Circuit Court has recognized with approval,

> [Section 14(a)] make[s] it possible for every stockholder to learn in advance of his giving a proxy what the proxy is sought for .... *It enables every stockholder to act intelligently with regard to the giving of his proxy, instead of putting him in a position where he gives his proxy through the process of signing a blank check.*

*SEC v. Falstaff Brewing Corp.*, 629 F.2d at 69, quoting Stock Exchange Practices: Hearings Before the Sen.Comm. on Banking & Currency, 73d Cong., 1st Sess. (pt. 16) 7716 (1934) (emphasis supplied). We agree.

For the foregoing reasons, it is, by the Court, this 26th day of July, 1984

ORDERED that the shareholder vote scheduled for July 31, 1984 with respect to the proposed merger contemplated by the Agreement and Plan of Merger dated April 30, 1984, among Woodward and Lothrop, Inc., Taubman Holdings, Inc. and Taubman Acquisitions, Inc. be and it hereby is enjoined; and it is further

ORDERED that defendants Woodward and Lothrop, Inc., Edwin K. Hoffman, Robert J. Mulligan, David P. Mullen, Andrew Parker, A. Lothrop Luttrell, John T. Koehler, John E. Larson, Karl W. Corby, Arthur C. Cox, Burl E. Albright, Lloyd H. Elliott, L. Stanley Crane, Walter E. Washington, Judith R. Hope, and their officers, agents and employees, shall be and they hereby are enjoined from voting any proxies received with respect to shareholder approval of the proposed merger contemplated by the Agreement and Plan of Merger dated April 30, 1984, among Woodward and Lothrop, Inc., Taubman Holdings, Inc. and Taubman Acquisitions, Inc.; and it is further

ORDERED that plaintiffs in *Dudley, et al. v. Hoffman, et al., Seibert v. Hoffman, et al.,* and *Stepak v. Hoffman, et al.,* post bond in the amount of ten thousand dollars ($10,000), cash or surety, no later than 12:00 noon, July 27, 1984; and it is further

ORDERED that this Temporary Restraining Order shall expire Monday, August 6 at 2:00 p.m. unless extended upon application by plaintiffs for a period of 10 days, as provided by Fed.R.Civ.P. 65; and it is further

ORDERED that the motion in *Dudley, et al. v. Hoffman, et al.* for a preliminary injunction shall be heard commencing August 6, 1984, at 10:00 a.m., in Courtroom 8, before The Honorable Aubrey E. Robinson, Jr.

## ON MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs in *Dudley v. Hoffman*, C.A. No. 84–2028, and *Seibert v. Hoffman*, C.A. No. 84–2051, two of the above-captioned consolidated actions, bring this motion for a preliminary injunction in anticipation of a

meeting of the shareholders of Woodward & Lothrop, Inc. ("W & L") scheduled for Tuesday, September 11, 1984.[1] At that meeting, W & L shareholders will vote, in person or by proxy, for or against a proposed merger agreement between W & L and defendants A. Alfred Taubman ("Taubman"), Taubman Holdings, Inc. ("THI") and/or Taubman Acquisitions, Inc. ("TDC"). The *Dudley* plaintiffs, all of whom are shareholders, descendants of founders of the company and members of a self-appointed "Woodward & Lothrop Shareholders' Protective Committee" (the "Shareholders' Committee"), joined by plaintiff Seibert, seek to restrict the voting power of the Taubman interests in that upcoming vote and to enjoin defendants W & L and/or its directors from proceeding with the scheduled vote or voting any proxies received with respect to shareholder approval of the proposed merger. Plaintiffs' motion, filed August 27, 1984, and defendants' opposition thereto were the subject of oral argument heard September 5, 1984.

Some five weeks ago, the legion of counsel participating in these consolidated actions assembled for hearing on plaintiffs' application for temporary injunctive relief to prevent the voting on July 31, 1984 of proxies solicited through allegedly defective proxy materials. Finding that the challenged proxy materials did not timely equip shareholders with the total mix of information mandated for an intelligent vote on the Taubman merger proposal, this Court granted plaintiffs' application. The Temporary Restraining Order entered on July 26, 1984, sets forth in detail the history of the Taubman merger proposal and the chronology of events surrounding this litigation. Those facts need not be repeated but are supplemented as follows.

On July 26, 1984, the same day that the Temporary Restraining Order issued, Monroe Milstein ("Milstein") addressed a letter to nonmanagement directors of W & L proposing an offer to acquire all issued and outstanding W & L common stock at $64 per share, $5 per share over the Taubman price. Between July 27 and 31, defendant Burl Albright, a nonmanagement director, met with Milstein to discuss the proposal. Upon receiving Albright's report that Milstein's proposal was indeed "serious", the W & L Board of Directors appointed Albright to a four-member Proposal Committee charged with further investigating the Milstein matter. The remaining three Proposal Committee members also comprised the Board of Directors' Special Committee responsible for answering the demand letter of the Shareholders' Committee tied to state law derivative claims raised in *Church v. Hoffman,* an action filed in the Superior Court of the District of Columbia. *See Dudley v. Hoffman,* July 26, 1984 Temporary Restraining Order at 8–9. The Proposal Committee was formed on July 31, 1984. Each member thereof is a nonmanagement director of W & L. On that same day, the Special Committee released its extensive determination that the *Church* claims should not be pursued and recommended that W & L move to dismiss similar claims in the actions before this Court and the Superior Court. On August 1, 1984, the parties appeared before Chief Judge Robinson of this Court, pursuant to

---

1. Although counsel for the *Dudley* plaintiffs announced to the Court that he spoke on behalf of all the plaintiffs (as he did at time of the Temporary Restraining Order) one day after oral argument on this motion, other counsel for plaintiff Stepak filed his Motion for Preliminary Injunction supporting the *Dudley* plaintiffs' motion but noting an additional challenge to the "lock-up option." Knowledgeable that on September 5, at conclusion of oral argument on the papers filed, the Court announced its decision would be forthcoming no later than Monday, September 10, 1984, plaintiff Stepak nevertheless seeks "expedited briefing" of defendants' presumed opposition to this Motion for Preliminary Injunction. This request comes too late; the matter could have been asserted prior to or at least at time of concluding argument on the motion, and not after the record was closed, decision imminent, and prejudice of delay obvious. No reason has been advanced for this inexplicable timing nor why Stepak did not coordinate his efforts with others who faced exact time restraints. The Motion for Expedited Briefing is denied; the Motion for Preliminary Injunction is considered herewith only insofar as it adopts the *Dudley* plaintiffs' challenges.

the July 26 Temporary Restraining Order. At that time, plaintiffs withdrew their motion for preliminary injunctive relief upon defendants' representation that W & L would not proceed on the existing proxy materials but would resolicit proxies in contemplation of a mid-September shareholder vote. Counsel for defendants stated before Chief Judge Robinson that a new record date for the vote would be selected. Transcript of August 1, 1984 Status Call at 5.

During the week of August 6–10, representatives of the Proposal Committee met with Milstein and, among other things, executed a bilateral confidentiality agreement to cover information used in negotiations. Meanwhile, on August 8, 1984, Taubman exercised his option (available since April 30, 1984) to buy 1,759,663 shares of W & L stock, or approximately 32% of the stock outstanding after the acquisition. Two days later, on August 10, 1984, the non-management directors set the date of the shareholder vote for September 11, 1984 and designated August 17, 1984 as the record date for that vote. Also on August 10, Milstein responded to Taubman's purchase by reducing his proposal price from $64 to $62.40 per share, unless Taubman's option were invalidated and his shares rescinded, in which case Milstein's price would remain at $64.

On August 17, 1984 the Proposal Committee reported to the Board on Milstein's proposal and pronounced it "a serious offer" despite the indefinite state of Milstein's financing abilities. After reviewing that report, the Board decided nonetheless to recommend shareholder approval of the Taubman merger proposal. That position is reflected in proxy materials dated and disseminated to shareholders on August 21, 1984 as follows:

In reaching this recommendation, your Board has taken into consideration the fact that the Merger Agreement and the credit arrangements between Acquisitions and its lenders terminate by their terms on September 30, 1984 and the $59 per share price may not thereafter be available to the shareholders. The Board

also considered that Holdings owns approximately 32% of the Company's outstanding common stock. The Board believes that, as a practical matter, any merger proposal made by Mr. Milstein will not obtain the requisite approval under the District of Columbia Business Corporation Act of two-thirds of the outstanding common stock if Holdings votes against it. In view of the foregoing, and after consideration of a report of a committee of independent directors appointed to investigate the Milstein proposal, the Board concluded that there is a substantial risk that the $62.40 price per share contemplated by the Milstein proposal will not be available to be paid to shareholders.

The Board further considered that although the Board of Directors may be able to pursue negotiations with Mr. Milstein (if he remains willing to do so), if the shareholders do not approve the Merger Agreement, there can be no assurance that (i) such negotiations will be held, (ii) any resulting proposal would be approved by the Company's shareholders in view of Holdings' ownership of Company Common Stock or (iii) shareholders would ultimately receive a higher price than $59 per share.

Defendants supplemented their proxy materials on August 29, 1984. On August 30, 1984, the Shareholders' Committee disseminated its own proxy materials to shareholders, urging rejection of the Taubman proposal.

As the September 11 shareholder vote approaches, plaintiffs seek injunctive relief against W & L, its directors and the Taubman interests on both federal and state law grounds. First, plaintiffs argue that the Taubman interests (Taubman, THI and/or TDC) are an affiliate of W & L within the meaning of SEC Rule 13e–3 promulgated under Section 13(e) of the Securities Exchange Act of 1934 ("the 1934 Act"). Because of that alleged relationship, plaintiffs claim, the Taubman proposal is subject to disclosure requirements mandated under Rule 13e–3, which neither W & L nor the Taubman interests have satisfied. Second,

plaintiffs allege that the August 21, 1984 proxy materials are false and materially misleading in several respects and therefore violate Section 14(a) of the 1934 Act and Rule 14a–9 thereunder. (Similar allegations were the focus of plaintiffs' challenges to W & L's first set of proxy materials ventilated during argument on the application for the July 26, 1984 Temporary Restraining Order.)

Turning to state law, plaintiffs argue that this Court has pendent jurisdiction over claims that (1) the W & L Board breached its fiduciary duty to the shareholders by negotiating and approving Taubman's option to purchase 32% of the company; (2) the effect of Taubman's stock purchase option and his exercise thereof is to circumvent D.C. corporate law requiring a ⅔ shareholder vote on merger proposals; (3) the W & L Board breached its fiduciary duty to the shareholders by resetting the record date to August 10, 1984; and (4) Taubman has a fiduciary duty to his fellow shareholders which would be reached if he votes in favor of his own proposal. Before discussing the 1934 Act and accompanying SEC Rules, we address these state law claims.

■ The doctrine of *res judicata* precludes relitigation of claims that have been decided on the merits in another lawsuit between the same parties or their privies. *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); *Thornton v. Little Sisters of the Poor*, 380 A.2d 593, 595 (D.C. 1977). To the extent that plaintiffs in these actions raise direct claims against the W & L directors for breach of fiduciary duty tracing to their negotiation and approval of the Taubman stock purchase option, the Order of June 22, 1984 in *Church v. Hoffman*, C.A. 6672–84 (D.C.Superior Court) is conclusive and bars relitigation here. In that Order, the Superior Court held that an identical claim was "founded on rights which may properly be asserted by the corporation and in which [plaintiffs'] rights are indirect and derivative only."

*Church v. Hoffman*, June 22, 1984 Order at 9. Subsequently, the Court denied reconsideration of that ruling. *Church v. Hoffman*, July 23, 1984 Opinion and Order Denying Motion for Partial Reconsideration.[2] The *res judicata* effect of that holding is no less forceful because plaintiffs now advance an untested legal theory— that the effect of the stock purchase option is to circumvent the ⅔ voting requirement, to the detriment of the shareholders to whom the directors owe fiduciary obligations. "Res judicata ... prevents the consideration not only of those issues which were litigated but also those which might have been litigated in the first action." *Thornton v. Little Sisters of the Poor*, 380 A.2d at 595. A new legal theory does not amount to a new claim, and the bar of *res judicata* cannot be overcome by ingenious adventuring, over a period of time, on new paths to the same goal. *See Migra v. Warren City School District Board of Education*, — U.S. —, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984). Furthermore, Taubman's August 8, 1984 exercise of the stock purchase option in no way transforms plaintiffs' claim into a "new" cause of action. The issue raised here is the same as that placed before the *Church* court: in negotiating and approving the option, did the Board breach a fiduciary duty? Whether the option is exercised or merely exercisable when the Court makes that determination is of no consequence.

■ To the extent that plaintiffs assert the identical claim of breach of fiduciary duty against the directors as a derivative action, the July 31, 1984 report of the Special Committee lays plaintiffs' argument to rest. The Special Committee, responding to the same claim raised in the *Church* action, specifically determined that "the Board's action on April 30, 1984 in approving the Stock Purchase Agreement as part of the Taubman transaction was a reasonable exercise of the directors' business judgment. Exh.K. to *Taubman* Defendants' Memorandum of Points and Authori-

---

**2.** *Church v. Hoffman* is now on appeal to the District of Columbia Court of Appeals.

ties at 21. Accordingly, the nonmanagement Board members decided not to pursue plaintiffs' challenge to that action based on alleged breach of fiduciary duty. In a demand-required case such as this, courts will defer to the directors' business judgment to forego litigation, absent some challenge to their investigative procedures or independence and good faith. *See Abramowitz v. Posner*, 672 F.2d 1025, 1031 (2d Cir.1982) (applying Delaware law); *see also Joy v. North*, 692 F.2d 880, 888 (2d Cir.1982), *cert. denied sub nom. Citytrust v. Joy*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983) (stating that judicial scrutiny of board's business judgment in demand-required cases is "limited"). Plaintiff acknowledges that while such challenges may be raised in the future, they are not before this Court. Although plaintiff Seibert, without citing authority, opposes the appointment of a committee to review the Shareholders' Committee demand, the Court finds that delegation an unremarkable exercise of the Board's business judgment.

■ Plaintiffs' third state-law claim against the Board of Directors is based on the resetting of the record date, an event clearly not considered by the Superior Court or Special Committee. Although plaintiffs cannot challenge this action as illegal, they nonetheless contend that the Board "went out of its way to set a new [August 17] record date [to enable] Mr. Taubman to vote" his shares acquired on August 8, Plaintiffs' Memorandum of Points and Authorities at 22; however, defendants convincingly dispute that charge. The *possibility* of resetting the record date in the event of a delay of the shareholder vote was mentioned to this Court in late July; the *plan* to do so was clearly stated on August 1, well before Taubman exercised his option. The rescheduling, although undeniably advantageous to Taubman, is arguably mandated by the language of D.C.Code § 29–328, which pro-

vides that a record date may be not more than 50 days prior to the date on which a shareholder vote is to be taken. The statute makes no provision for extending that period in the event of the adjournment and postponement of a scheduled meeting and vote. The original record date set for the scheduled July 31 shareholder meeting was June 21, 1984. Having committed itself to a mid-September meeting date, the Board chose to avoid a potential § 29–328 violation by setting a new record date and, following common practice, did so upon receiving SEC clearance of W & L's revised proxy materials. A decision to retain the original record date, as plaintiffs would have preferred, would have excluded Taubman's option shares from the merger decision but only at the extreme price of jeopardizing the validity of the September 11 vote. In choosing the prudent course, the Board did not breach its fiduciary obligation to the shareholders.

■ Plaintiffs assert their fourth state-law claim against Taubman, arguing that as "controlling shareholder" of W & L, Taubman has a fiduciary duty to his fellow shareholders which precludes his voting in favor of his own merger proposal. With certainty, Taubman stands to gain should his proposal succeed, but it is the shareholders who must determine whether they too would gain: the Court is satisfied that neither choice is without its advantages or disadvantages; one offers security, the other, wealth.[3] On September 11 the shareholders face a choice between the *certainty* of Taubman's $59 per share offer and the *possibility* of Milstein's more attractive $64 price. The choice is focused and fascinating: should the voters follow the urgings of management and approve the Taubman proposal or should they heed the warnings of the Protective Committee, descendants of the founders of the company, and reject the merger? With a viable

---

**3.** Although plaintiffs object to the value of financial benefits to senior management under the Taubman proposal, the real issue is money. Those same benefits, accompanied by a price more to plaintiffs' liking, would not be chal-

lenged for their own sake—plaintiffs' concern is that the effect of the benefits to senior management is to deter consideration of competing (higher) offers, thus guaranteeing a "bargain price" to Taubman.

choice, this becomes a matter for shareholder democracy, not judicial takeover.

■ We turn now to plaintiffs' claims under federal law. A substantial part of the parties' oral argument on this motion was devoted to plaintiffs' claim that the W & L defendants and Taubman interests have violated Section 13(e) of the 1934 Act and SEC Rule 13e–3, which prohibits issuers of stock and their affiliates from engaging in "going private" transactions without timely filing and disseminating to shareholders an SEC Schedule 13e–3. *See* 17 C.F.R. § 240.13e–3(a)(3) (1983). Rule 13e–3 applies only to transactions between an issuer and its affiliate. 17 C.F.R. § 240.13e–3(c) (1983). The status of W & L as an issuer is not in dispute. The status of Taubman/THI/TDC as an affiliate is strenuously contested.

Rule 13e–3 defines an "affiliate" as "a person that directly or indirectly through one or more intermediaries controls, or is controlled by, or is under common control with [the] issuer." 17 C.F.R. § 240.13e–3(a)(1) (1983). According to SEC interpretive releases and case law,

> the existence of a control relationship ... does not turn solely upon the ownership of any specific percentage of securities. Rather, the question is whether there is the ability, directly or indirectly, to direct or cause the direction of management and policies of [the target company], whether through the ownership of voting securities, by contract or otherwise.

*Radol v. Thomas*, 556 F.Supp. 586, 592 (S.D.Ohio 1983), quoting SEC Release No. 34–17719 [1981] 2 Fed.Sec.L.Rep. (CCH) ¶ 23,709 (April 13, 1981).

Examining first Taubman's pre-merger agreement relationship with W & L and its Board, there is no evidence whatsoever that Taubman was in any position to direct W & L management and policy when the merger agreement was executed. Plaintiffs can point to no more than what is either a "close personal friendship" (plaintiffs' contention) or, as defendants present it, a business relationship and friendship with the Chairman of the Board, connect-ing Taubman with the company at that time. This situation hardly compares to the close pre-merger relationship underlying *No-Action Letter re: Atlantic Metropolitan Corp.*, (April 15, 1984) (Exhibit O to Plaintiffs' Memorandum of Points and Authorities) upon which plaintiffs rely.

Upon execution of the merger agreement and its approval by the Board on April 30, 1984, Taubman acquired an option to purchase shares and a right to enforce negative covenants in the agreement preventing W & L from taking extraordinary corporate actions without his approval during the term of the agreement. *See* Merger Agreement; Article VI, § 6.1, Exhibit I to Plaintiffs' Memorandum of Points and Authorities at 7–8. Neither of these confer the "control" contemplated by Rule 13e–3's definition of an affiliate. *See Radol v. Thomas*, 556 F.Supp. 586, 592 (S.C.Ohio 1983); *see also Radol v. Thomas*, 534 F.Supp. 1302 (S.D.Ohio 1982) (negative covenants held not sufficient to rise to the level of control).

Even after acquiring approximately 32% of W & L's outstanding shares, Taubman still lacked the control over W & L that would bring the proposed merger within the coverage of Rule 13e–3. Even were Taubman able to influence senior management by the terms of the merger agreement which generously redound to their benefit, the majority of the Board has no monetary incentive to favor Taubman's proposal. That the Board's decisions to reset the record date and to recommend shareholder approval of the Taubman offer work to Taubman's advantage does not demonstrate control. As discussed above, those decisions were committed to the business judgment of the Board—plaintiffs have shown only a coincidence of Taubman's and the Board's views, not a subordination of the Board's independence. Perhaps most telling is the willingness of Milstein to invest time and money and to negotiate *in confidence* with the Proposal Committee in efforts towards developing a competing merger offer. Were the Board completely within Taubman's shadow, or at

least under Taubman's substantial dominance and control, such efforts by Milstein would be futile, and even dangerous, given the confidential nature of the data he has provided to the Board. Accordingly, as Taubman at no time controlled, was controlled by, or was under common control with W & L, the Taubman interests are not an "affiliate" of W & L within the meaning of Rule 13e–3 and the filing requirements of that Rule do not apply to the Taubman merger transaction.

Plaintiffs' final federal claim rings a note of familiarity. As in July, 1984 plaintiffs challenge the content of defendants' proxy solicitations under Section 14(a) of the 1934 Act and Rule 14a–9 thereunder. In pertinent part, SEC Rule 14a–9 prohibits, in connection with the solicitation of proxies, the making of any statement that is false or misleading as to any material fact, or that omits any material fact necessary to make the statement not false or misleading. *See* 17 C.F.R. § 240.14a–9 (1983); *see also Dudley v. Hoffman,* July 25, 1984 Temporary Restraining Order at 13, 15. In plaintiffs' view, the August 21 proxy materials are false or materially misleading in their description of (1) the process through which the Taubman proposal was negotiated, (2) the timing and value of benefits promised to senior management under the Taubman proposal, (3) the value of W & L's real estate, and (4) the Milstein proposal. In addition, plaintiffs contend that, all other challenges aside, the August 21 proxy materials and August 29 supplementation are defective because they stress Taubman's ability to effectively block competing offers but fail to state that the voting rights of Taubman *as a controlling shareholder* may be limited. In light of our prior rejection of plaintiffs' characterization of Taubman as a controlling shareholder, this last argument is quickly rejected. As to plaintiffs' remaining disputes with the proxy materials, they reveal only differences of viewpoint, or analyses, or judgments, but not a gap in the "total mix" of information that a reasonable shareholder would consider important in deciding how to vote. *See TSC*

*Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Dudley v. Hoffman,* July 26, 1984 Temporary Restraining Order at 15. Although plaintiffs' 14(a) claims are familiar, the context in which we now view them has dramatically changed. Six weeks ago, eleventh-hour mailings containing critical information bearing on the impending vote were in the mail, unlikely to reach many, perhaps most, shareholders in time to allow reasoned consideration and a responsible vote. Now, volumes of documents from both management and the Protective Committee are in the hands of the shareholders. Those papers fully, indeed, exhaustively, present the views, the theories, the challenges, the arguments, the conclusions, of both sides. The elements of defendants' materials perceived as shortcomings (or worse) by plaintiffs reflect differing opinions and differing expert calculations, not material misstatements or omissions; almost certainly, defendants could find similar "faults" in the materials disseminated by plaintiffs. What is important is that the shareholders are armed with all the information that they need to vote on September 11, 1984. Full and fair disclosure is the goal of § 14(a). *See e.g., Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); *SEC v. Falstaff Brewing Corp.,* 629 F.2d 62 (D.C.Cir.1980), *cert denied sub nom. Kalmanovitz v. SEC,* 449 U.S. 1012, 101 S.Ct. 569, 66 L.Ed.2d 471 (1980). That goal has now been satisfied.

As demonstrated by the above, plaintiffs have not shown a "likelihood of success" or even a "substantial case" on the merits of their claims, a necessary prerequisite to the allowance of the injunctive relief they seek. Nor could they, under the circumstances herein, meet the other three requirements for a preliminary injunction. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 843 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921 (D.C.Cir.1958); *Brink's, Inc. v. Board of*

*Governors of the Federal Reserve System,* 466 F.Supp. 112, 115 (D.D.C.1979).

Accordingly, plaintiffs' motion for a preliminary injunction is denied.

The choice is at hand. Whether the vote at the September 11, 1984 shareholders' meeting be for or against the proposed merger agreement, it must be expressed through the democratic vote of all the shareholders, the heartbeat of this corporation.

It is further ORDERED that in the event there is an appeal of this decision, plaintiffs in *Dudley, et al. v. Hoffman, et al., Seibert v. Hoffman, et al.,* and *Stepak v. Hoffman, et al.,* post bond in the amount of ten thousand dollars ($10,000), cash or surety, no later than 4:00 p.m. this 10th day of September, 1984.