Merle BREWER, et al., Plaintiffs,

v.

LINCOLN INTERNATIONAL
CORPORATION, et al.,
Defendants.

No. CIV.A. 3:99CV–178–S.

United States District Court,
W.D. Kentucky,
at Louisville.

Dec. 20, 2000.

794

John Robert Shelton, Parker & O'Connell, PLC, Louisville, KY, for plaintiff.

Donald L. Cox, Clare Feler Cox, Lynch, Cox, Gilman & Mahan, PSC, Louisville, KY, for defendant.

## MEMORANDUM OPINION

SIMPSON, Chief Judge.

This matter is before the court for consideration of the motion of the defendants,

Lincoln International Corporation, Lee Sisney, Richard Dolin, David Barhorst, and LTG, Inc., to dismiss the Amended Complaint of the plaintiffs, Merle Brewer ("Brewer") and Terry Kennedy ("Kennedy"). The ground for this motion is unspecified. Because of the language used by the defendants throughout their motion, *see* Defs.' Mot. to Dismiss at 1, 63, we elect to treat it as having been brought pursuant to Fed.R.Civ.P. 12(b)(6), although the court would prefer that in the future, the moving parties clearly articulate the procedural ground for the relief sought. The plaintiffs filed their Amended Complaint against Lincoln International Corporation ("LINCO"), several individuals who have served as officers and directors of LINCO, and LTG, Inc. ("LTG") alleging violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, as well as several violations of Kentucky state law. For the reasons set forth below, the defendants' motion will be granted in part and denied in part.

## BACKGROUND

The plaintiffs' cause of action arises out of the circumstances surrounding the 1999 sale of the Bourbon Stock Yard property located in Louisville, Kentucky ("the Stock Yard real estate") by LINCO. Essentially, the plaintiffs claim that prior to the sale of the real estate, LINCO, LTG, and several individuals associated with LINCO made material misrepresentations and omissions regarding its value. The plaintiffs make several legal claims, based on both state and federal law, which will be discussed in detail below.

### A. The Parties

The two named plaintiffs are individuals who, at the time of the events described below, owned shares of LINCO common stock. The plaintiffs also claim that they are "adequate representatives" of a class of similarly situated LINCO shareholders who were also allegedly injured as a result of defendants' conduct. Pls.' Am. Compl. at ¶¶ 9, 15.

Defendant LINCO is a Kentucky corporation which, until March of 1999, owned the Bourbon Stock Yard property. Defendant Lee Sisney ("Sisney") acted as President and as a director of LINCO at all times relevant to the plaintiffs' claim. Defendants Richard Dolin ("Dolin") and David Barhorst ("Barhorst") were also directors of LINCO during the relevant time period. Defendant LTG is now, as a result of the events described below, the majority shareholder of LINCO.

### B. Chronology of Relevant Events [1]

The plaintiffs allege that before Sisney became a shareholder, an officer, or a director of LINCO, he and another investor tried unsuccessfully to buy the Bourbon Stock Yard in 1989 for $3,000,000. Four years later, in December of 1993, the plaintiffs allege that LINCO real estate was appraised at a value of $2,800,000 ("the 1993 appraisal"). The plaintiffs also contend that in January of 1994, a partnership consisting of Sisney and several other individuals attempted to purchase the real estate for $2,400,000. The plaintiffs claim that their offer was again refused by LINCO.

Between October of 1994 and February of 1995, Drivers and Drovers Diversified, Inc. ("D & D"), a corporation of which Sisney was a 50% owner, is alleged to have accumulated 91% of LINCO's voting stock and 19% of its non-voting stock. Sisney

---

**1.** For the purposes of this motion to dismiss, we "accept the allegations of the complaint as true ...." *See Cooper v. Parrish,* 203 F.3d 937, 944 (6th Cir.2000) (citing *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989)).

allegedly became the sole shareholder of D & D at some point prior to January of 1997.

The plaintiffs contend that in January of 1997, LTG made a tender offer to LINCO's Board of Directors and its shareholders ("the January 1997 tender offer"). LTG allegedly offered to purchase 900,000 shares of non-voting LINCO stock at $0.30 per share. The plaintiffs contend that LTG's offer had two relevant contingencies. First, the offer was contingent upon a minimum of 900,000 shares being tendered by shareholders. Second, the offer was contingent upon the amendment of LINCO's Articles of Incorporation to give non-voting shares voting rights. The plaintiffs contend that pursuant to the tender offer, D & D, of which Sisney was President, Chief Executive Officer, and sole shareholder, agreed to vote their LINCO shares in favor of amending the Articles of Incorporation. In exchange, LTG allegedly agreed to retain Sisney as President of LINCO and to give Sisney an option to buy 50% of the stock in LTG for $10,000.

The plaintiffs contend that the written consideration did not refer to the 1993 appraisal, Sisney's prior attempts to purchase the real estate, or the tax assessed value of the Stock Yard real estate. According to the plaintiffs, "Defendants intentionally misrepresented the real estate solely as a liability and intentionally omitted the [information regarding the appraisal and Sisney's efforts to purchase] in order to deceive Plaintiffs and the Class Members into selling their shares for $0.30 per share." Pls.' Resp. at 5–6.

The plaintiffs allege that the terms of the offer were accepted by at least the minimum number of shares required by LTG's tender offer, and that LTG gained majority control over LINCO as a result. Following the LTG tender offer, Sisney allegedly exercised his option to purchase 50% of the LTG stock for $10,000. Therefore, the plaintiffs claim that in the fall of 1997, Sisney was a 50% owner of LTG; LTG was the majority owner of LINCO; and LINCO's primary asset was the real estate that was eventually sold in 1999.

The plaintiffs further allege that in November of 1997, the LINCO Board of Directors proposed a reverse stock split in which each LINCO shareholder would get one new share for every four hundred (400) old shares he or she owned ("the December 1997 reverse stock split"). According to the resolution, if a shareholder owned less than 400 old shares, then he or she would get scrip in lieu of the shares which LINCO would then buy back for $0.30 per share if tendered within one hundred twenty (120) days of the date of the split. If the scrip was not tendered within the 120 day period, "the holder of said scrip shall have no further claim against the Company, all rights having been expunged at the expiration of the life of the scrip." Defs.' Mot. to Dismiss at 17–18.

LTG allegedly voted its LINCO shares in favor of the resolution, and it passed at the annual shareholders meeting held on December 5, 1997. Plaintiff Brewer is said to have owned 100 shares of LINCO stock at the time of the reverse split which, during the 120 day period, were tendered for $0.30 per share. Plaintiff Kennedy is said to have owned 220 shares of LINCO stock at the time of the reverse split, which he did not tender within the 120 day window and which thereafter became worthless.

According to the plaintiff, the 120 day period expired on or about April 5, 1998. In May of that same year, LINCO's Board of Directors allegedly voted to enter into negotiations with the Home of the Innocents, Inc., a local charitable organization,

to sell part of the real estate owned by LINCO. The plaintiffs contend that in November of 1998, the Home of the Innocents contracted to buy the real estate for $3,400,000 and that the sale closed on March 5, 1999. On March 23, 1999, the plaintiffs filed their original Complaint.

The plaintiffs set forth several claims in their Amended Complaint. Both the state and federal law claims of the plaintiff are based on several alleged misrepresentations or omissions which include: (1) the defendants' failure to disclose the 1993 appraisal at the time of the LTG tender offer; (2) the defendants' "one-sided negative treatment" of LINCO's assets in the correspondence sent to LINCO shareholders regarding the LTG tender offer; (3) the defendants' failure to disclose Sisney's prior attempts to acquire the real estate at the time of the LTG tender offer; (4) the defendants' failure to disclose the tax assessed value of the real estate at the time of the LTG tender offer; and (5) the defendants' failure to distinguish between the book value of the real estate and its fair market value at the time of the LTG tender offer. *See* Pls.' Resp. at 11.

The plaintiffs essentially raise two claims against the defendants based on federal law.[2] First, the plaintiffs allege that the disclosures made by the defendants to LINCO shareholders at the time of the January 1997 LTG tender offer either misrepresented or omitted material facts in violation of 15 U.S.C. § 78j and 17 C.F.R. § 240.10b–5[3] ("Rule 10b–5"). The plaintiffs next allege that the January 1997 LTG tender offer was a "going private" transaction within the meaning of 15 U.S.C. § 78m(e) and 17 C.F.R. § 240.13e–3[4] ("Rule 13e–3"). As such, the plaintiffs allege that the misrepresentations and omissions referred to above violated Rule 13e–3.[5]

The plaintiffs' Amended Complaint also contains several state law claims against various defendants. The plaintiffs claim that Sisney, as an officer of LINCO, violated the duty of care owed to shareholders in violation of Ky.Rev.Stat. Ann. § 271B.8–

---

**2.** The plaintiffs' federal claims against the individual defendants, Sisney, Barhorst, and Dolin, are grounded in their allegation that the individuals were, at the relevant times, "controlling persons" of LINCO within the meaning of 15 U.S.C. § 78t.

**3.** Rule 10b–5 states in relevant part:

It shall be unlawful for any person ... (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

**4.** Rule 13e–3, as it is relevant to the plaintiffs' claims, defines a "going private transaction" as "a tender offer for or request or invitation

for tenders of any equity security made by the issuer of such class of securities or by an affiliate of such issuer" which causes "any class of equity securities of the issuer which is subject to section 12(g) or section 15(d) of the Act to be held of record by less than 300 persons." 17 C.F.R. § 240.13e–3(a)(3)(i)(B), (a)(3)(ii)(A).

**5.** Rule 13e–3 states in relevant part:

(1) It shall be a fraudulent, deceptive or manipulative act or practice, in connection with a Rule 13e–3 transaction, for an issuer ... or an affiliate of such issuer, directly or indirectly (i) to employ any device, scheme or artifice to defraud any person; (ii) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

420. The plaintiffs further allege that Sisney, Dolin, and Barhorst, as directors, violated the duty of care owed to shareholders in violation of KRS § 271B.8–300. In addition to their federal securities law claims, the plaintiffs allege that the defendants' conduct violated KRS § 292.320, the Kentucky Blue Sky Law. The plaintiffs claim that Sisney and LTG violated the common law fiduciary duty they owed to LINCO shareholders by acting fraudulently in connection with the January 1997 tender offer and the December 1997 reverse stock split. Finally, the plaintiffs claim that the defendants violated KRS § 271B.13–200 by failing to advise the plaintiffs of their right to dissent from the resolution which authorized the December 1997 reverse stock split.

## STANDARD OF REVIEW

When considering a motion to dismiss, this court must determine whether a reasonable jury could find for the plaintiffs under any set of facts. *Cheatham v. Paisano Publications, Inc.,* 891 F.Supp. 381, 384 (W.D.Ky.1995). In making this determination, the court will construe the complaint in the light most favorable to the non-moving party. *Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995), *cert. denied,* 516 U.S. 1158, 116 S.Ct. 1041, 134 L.Ed.2d 189 (1996). Also, we are bound to indulge in all reasonable inferences which might be drawn from the complaint. *Fitzke v. Shappell,* 468 F.2d 1072, 1077 n. 6 (6th Cir.1972). Only when it appears beyond doubt that the plaintiffs would be unable to recover under any set of facts that could be presented consistent with the allegations of the complaint will such a motion be granted. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

■ Complaints which allege violations of the Securities Exchange Act of 1934, 15 U.S.C. § 78a, must also satisfy the requirements of the Private Securities Litigation Reform Act of 1995 ("P.S.L.R.A."), 15 U.S.C. § 78u–4, in order to survive a defendant's motion to dismiss for failure to state a claim upon which relief can be granted. The P.S.L.R.A. states, in relevant part:

In any private action arising under this chapter in which the plaintiff alleges that the defendant (A) made an untrue statement of a material fact; or (B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b).

District courts have construed this statute to require plaintiffs alleging fraud under § 78 to identify:

(1) the parties and the participants to the alleged fraud; (2) the time, place, and content of the representations; (3) each statement alleged to have been misleading; (4) the reason or reasons why the statement is misleading; (5) if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed; (6) the fraudulent scheme; (7) the fraudulent intent of the defendants; (8) reliance on the fraud; and (9) the injury resulting from the fraud.

*Havenick v. Network Express, Inc.,* 981 F.Supp. 480, 524 (E.D.Mich.1997).

## DISCUSSION

### A. Plaintiffs' Rule 10b–5 Claim

■ In order to state a claim under § 78j of the Securities Exchange Act and Rule 10b–5, promulgated thereunder by the S.E.C., a plaintiff must allege (1) a misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) that the misrepresentation or omission was one of material fact; (3) that it was made with scienter; (4) that the plaintiff reasonably relied on it; and (5) that it proximately caused the plaintiff's injury. *See In Re: Comshare, Inc. Securities Litigation*, 183 F.3d 542, 548 (6th Cir.1999) (citing *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir.1991) (citations omitted)).

The defendants seek dismissal of the plaintiffs' Rule 10b–5 claim on several grounds. First, the defendants contend that there were no misrepresentations or omissions on their part which would violate Rule 10b–5. *See* Defs.' Mot. to Dismiss at 23. Next, the defendants argue that the information alleged to have been withheld or misrepresented was not material for purposes of Rule 10b–5. *See* Defs.' Mot. to Dismiss at 28. Assuming in the alternative that the court finds materiality and misrepresentation, the defendants contend that the plaintiffs have failed to allege scienter on the part of the defendants. *See id.* at 33. Finally, the defendants claim that because the plaintiffs neither purchased nor sold securities within the meaning of Rule 10b–5, there could have been no Rule 10b–5 violation. *See id.* at 37. As discussed below, we find that the plaintiffs have alleged facts sufficient to support a finding by a reasonable jury that the defendants violated Rule 10b–5.

### 1. Misrepresentations or Omissions of Material Fact

The defendants make two arguments with regard to whether their alleged failure to disclose the contents of the 1993 appraisal constituted a misrepresentation or omission within the meaning of Rule 10b–5. First, the defendants contend that because the 1993 appraisal of the Bourbon Stock Yard was available to the public at all times relevant to this action, their failure to specifically mention the appraisal at the time of the January 1997 tender offer does not constitute a misrepresentation or omission within the meaning of Rule 10b–5.[6] *See* Defs.' Mot. to Dismiss at 23–32. Second, the defendants contend that 1993 appraisal contained unreliable, subjective information which need not be disclosed pursuant to Rule 10b–5.

### a. Public Disclosure

■ Courts have generally concluded that whether public disclosure of information relieves any duty to disclose arising under federal securities laws is a question of reasonableness. *See, e.g., Myzel v. Fields*, 386 F.2d 718 (8th Cir.1967); *Powell v. American Bank & Trust Co.*, 640 F.Supp. 1568 (N.D.Ind.1986); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949 (2d Cir. 1978). In other words, is it reasonable to conclude that the plaintiffs should have been made aware of the fact as a result of the public disclosure? *See Powell, supra,* at 1579.

6. While the plaintiffs have alleged other misrepresentations and omissions on the part of the defendants other than the 1993 appraisal, the defendants argue only that the nondisclosure of the appraisal at the time of the 1997 tender offer was not a misrepresentation or omission within the meaning of Rule 10b–5. Therefore, we will only address whether the nondisclosure of the contents of the 1993 appraisal may constitute a misrepresentation or omission within the meaning of Rule 10b–5.

Here, the defendants rely on the fact that the contents of the 1993 appraisal were available to the public as early as October 5, 1995 when a Schedule 13E–3 was filed with the S.E.C. in connection with LINCO. S.E.C. filings such as a Schedule 13E–3 are generally available via EDGAR, the database of corporate information maintained by the S.E.C.[7] The defendants do not maintain that either the appraisal or its contents were otherwise made available to LINCO shareholders. The defendants appear to take the position that any public disclosure of information is sufficient to put shareholders on notice of the information disclosed. However, as the court in *Powell, supra,* stated:

> Such a narrow view of a defendant's liability would be inconsistent with the policies behind the securities laws, as it would allow defendants to take advantage of uninformed persons. It is more consistent with those policies to make defendants liable unless it is reasonable that the disclosure should have made the plaintiff aware of the facts.

*Id.* at 1580.

■ Assuming there was a duty on the part of the defendants to disclose the contents of the 1993 appraisal, we cannot say on the record before us that this sort of public disclosure discharges that duty.

Therefore, we find that the plaintiffs have sufficiently alleged facts upon which a reasonable jury could conclude that the defendants' failure to disclose the 1993 appraisal at the time of the January 1997 tender offer constituted a misrepresentation or omission within the meaning of Rule 10b–5.[8]

### b. Materiality

■ The defendants alternatively argue that they were under no duty to disclose the information alleged by the plaintiffs to have been withheld. *See* Defs.' Mot. to Dismiss at 28–32; Defs.' Reply at 5–9. Because such a duty arises only when the information withheld is material within the meaning of Rule 10b–5, we must determine whether the plaintiffs have sufficiently alleged facts upon which a reasonable jury could find that the information alleged to have been withheld was material. As discussed below, we find that the plaintiffs have carried their burden.

■ The Supreme Court defined materiality in the context of federal securities regulation in *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976).[9] The Court held that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it im-

---

7. The S.E.C. describes EDGAR as:

 [T]he Electronic Data Gathering, Analysis, and Retrieval system, [that] performs automated collection, validation, indexing, acceptance, and forwarding of submissions by companies and others who are required by law to file forms with the U.S. Securities and Exchange Commission (SEC). Its primary purpose is to increase the efficiency and fairness of the securities market for the benefit of investors, corporations, and the economy by accelerating the receipt, acceptance, dissemination, and analysis of time-sensitive corporate information filed with the agency.

8. Because we conclude that there remains a question of when the plaintiffs should have become aware of the contents of the 1993 appraisal, we also reject the defendants' argument that the plaintiffs' Rule 10b–5 claim is barred by the applicable statute of limitations. *See* Defs.' Mot. to Dismiss at 26–28.

9. In *TSC Industries,* the Court defined "material" in the context of Rule 14a–9 which governs disclosure requirements in proxy statements. However, the same definition has been adopted "for cases involving Rule 10b–5 in the tender offer context." *Starkman v. Marathon Oil Co.,* 772 F.2d 231, 238 (6th Cir.1985) (citations omitted).

portant in deciding how to vote." *Id.* at 449, 96 S.Ct. 2126. The Court explained:

> What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*Id.*

■■■■ Determinations of materiality are generally issues that are left to juries. *See, e.g., U.S. v. DeSantis,* 134 F.3d 760, 764 (6th Cir.1998); *James v. Gerber Products Co.,* 587 F.2d 324, 327 (6th Cir.1978). With respect to whether materiality may be determined as a matter of law, the *TSC Industries* Court held [10]:

> The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones

for the trier of fact. Only if the established omissions are "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" is the ultimate issue of materiality appropriately resolved "as a matter of law" by summary judgment.

*TSC Industries, supra,* at 450, 96 S.Ct. 2126 (footnotes and citations omitted).

■■■■ Against this clear preference for allowing the factfinder to determine whether an alleged misrepresentation or omission was material is balanced a distrust on the part of courts of so-called "soft information." *See generally, e.g., Garcia v. Cordova,* 930 F.2d 826, 830 (10th Cir.1991). Soft information has been defined as " 'information about a particular issuer or its securities that inherently involves some subjective analysis or extrapolation, such as projections, estimates, opinions, motives, or intentions.' " *Id.* (citing Hiler, *The SEC and the Courts' Approach to Disclosure of Earnings Projections, Asset Appraisals, and Other Soft Information: Old Problems, Changing Views,* 46 Md. L.Rev. 1114, 1116 (1987)). Hard information, on the other hand, "is typically historical information or other factual information that is objectively verifiable. . . . ." *Id.* (citing Hiler, *supra,* at 1116–17). While courts readily find that a duty to disclose hard information exists, some courts are generally reluctant to find such a duty to disclose soft information. *See Starkman v. Marathon Oil Co.,* 772 F.2d 231, 241 (6th Cir.1985) (holding that "soft information such as asset appraisals and

---

**10.** The *TSC Industries* Court confronted the materiality issue in the face of the defendants' motion for summary judgment, whereas we are faced with the defendants' motion to dismiss. "[W]hile a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an

opportunity for a supplementation of the record, and accordingly a greater showing is demanded of the plaintiff." *Wilderness Society v. Griles,* 824 F.2d 4, 16 (D.C.Cir.1987). Therefore, we are even less inclined to dismiss the plaintiffs' claim based on our conclusion that the defendants' alleged misrepresentations and omissions were not material.

projections must be disclosed only if the reported values are virtually as certain as hard facts"). *But see Radol v. Thomas,* 556 F.Supp. 586, 594 (S.D.Ohio 1983) (holding that whether asset valuations are material "is a question that is best left to a jury"). This distrust of soft information is based generally on its perceived unreliability. *See Gerstle v. Gamble–Skogmo, Inc.,* 478 F.2d 1281, 1294 (2d Cir.1973).

However, other courts have recognized that soft information is not inherently unreliable. *See Flynn v. Bass Bros. Enterprises, Inc.,* 744 F.2d 978 (3rd Cir.1984). After discussing the general distrust of soft information on the part of courts, and after noting a shift in the S.E.C.'s policy toward soft information in recent years, the *Flynn* court held:

> Henceforth, the law is not that asset appraisals are, as a matter of law, immaterial. Rather, in appropriate cases, such information must be disclosed. Courts should ascertain the duty to disclose asset valuations and other soft information on a case by case basis, by weighing the potential aid such information will give a shareholder against the potential harm, such as undue reliance, if the information is released with a proper cautionary note. The factors a court must consider in making such a determination are: the facts upon which the information is based; the qualifications of those who prepared or compiled it; the purpose for which the information was originally intended; its relevance to the stockholders' impending decision; the degree of subjectivity or bias reflected in its preparation; the degree to which the information is unique; and the availability to the investor of other more reliable sources of information.

*Flynn, supra,* at 988.

While the sixth circuit made it difficult for plaintiffs to rest their Rule 10b–5

claims on nondisclosures of soft information in *Starkman, supra,* the court did not hold that soft information can never be found to be material. *See Starkman,* 772 F.2d at 241. Whether the "reported values" in the 1993 appraisal of the Bourbon Stock Yard property "are virtually as certain as hard facts" is uncertain due to the preliminary stage at which the parties find themselves. This uncertainty, coupled with the strong reluctance on the part of courts to determine materiality discussed above, justifies our conclusion that the plaintiffs have sufficiently alleged facts upon which a reasonable jury could find that the nondisclosure of the 1993 appraisal at the time of the January 1997 tender offer was "material." For the same reasons, we find that the plaintiffs have also carried their burden with respect to the other nondisclosures they allege to be misrepresentations or omissions of material fact.

### 2. Scienter

In order to state a claim upon which relief can be granted, the plaintiffs must allege that the defendants made material misrepresentations or omissions with scienter. *See Aschinger v. Columbus Showcase Co.,* 934 F.2d 1402, 1409 (6th Cir.1991). "Scienter," for the purposes of Rule 10b–5, is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Prior to the enactment of the Private Securities Litigation Reform Act of 1995 ("P.S.L.R.A."), scienter could be averred generally by private plaintiffs. *See Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.,* 940 F.Supp. 1101, 1125 (W.D.Mich.1996) (citing Fed.R.Civ.P. 9(b)). However, in response to the perceived abuse of securities laws by private plaintiffs, Congress enacted the

P.S.L.R.A. which "changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss." *In re Comshare Inc. Securities Litigation*, 183 F.3d 542, 548–49 (6th Cir.1999). The P.S.L.R.A. states in part:

In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2).

The sixth circuit recently interpreted this statute in *Comshare, supra*. The court concluded that Rule 10b–5 plaintiffs can survive a motion to dismiss by alleging facts giving rise to a strong inference of either intentional or reckless conduct, "but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud." *Comshare, supra*, at 549. The court made clear that the recklessness which may be alleged is "a mental state apart from negligence and akin to conscious disregard . . . ." *Id.* Therefore, we turn to the issue of whether the plaintiffs have sufficiently alleged either intentional or reckless conduct on the part of the defendants.

Measuring the allegations contained in the plaintiffs' Amended Complaint in the light most favorable to the plaintiffs, we find that the heightened pleading requirement imposed by the P.S.L.R.A. has been met. The series of events claimed by the plaintiffs to have occurred between June of 1989 and March of 1999 allege more than merely the motive or opportunity to commit securities fraud. *See* Am. Compl. at ¶¶ 23–60. Rather, the allegations of the plaintiffs, if true, describe conduct on the part of the defendants which may be violative of Rule 10b–5 and other federal securities laws. The relevant facts alleged by the plaintiffs include: (1) Sisney's failed attempts to purchase the Bourbon Stock Yard property in 1989 and in 1994; (2) the option to purchase, for $10,000, a 50% stake in LTG given to Sisney by LTG in exchange for Sisney's support of an amendment to the LINCO Articles of Incorporation helpful to LTG; (3) the fact that this agreement may not have been disclosed to shareholders by LINCO; (4) the 400–for–1 reverse stock split resolution passed in December of 1997; and (5) the proximity in time between the date on which scrip held by LINCO shareholders became valueless and the date negotiations began with the Home of the Innocents. The plaintiffs argue that the above allegations illustrate "a scheme [on the part of the defendants] to acquire the bulk of the minority shareholders' interest in [LINCO] at a bargain basement price so as to allow the majority shareholders to reap the greatest possible benefits from the sale of [LINCO]'s primary assets." Pls.' Resp. at 18–19. We believe that these allegations, coupled with reasonable inferences drawn from them, could give rise to a "strong inference" of intentional conduct, or at least recklessness, on the part of the defendants.

### 3. In Connection With the Purchase or Sale of Securities

The defendants finally contend that even if they made misrepresentations or omissions of material fact with scienter, they did not do so in connection with the purchase or sale of securities. In support of this contention, the defendants argue that the "forced sale" doctrine upon which the plaintiffs rely is "defunct." *See* Defs.' Reply at 11.

■ The parties do not dispute that the class of potential Rule 10b–5 plaintiffs is limited to actual buyers and sellers of securities. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731–32, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). The sixth circuit has held that to do otherwise "would open the door to federal jurisdiction in claims for damages against corporate directors and officers arising out of breach of their fiduciary duties." *Simmons v. Wolfson*, 428 F.2d 455, 456 (6th Cir.1970). However, a purchase or, in this case, a sale of securities must be defined broadly in order to fulfill the purposes of the Securities Exchange Act of 1934. *See Superintendent of Insurance v. Bankers Life and Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). In fact, a purchase or sale of securities within the meaning of Rule 10b–5 may "encompass transactions that bear little resemblance to conventional purchases and sales." *Watts v. Des Moines Register and Tribune*, 525 F.Supp. 1311, 1319 (S.D.Iowa 1981) (citing *Sacks v. Reynolds Securities, Inc.*, 593 F.2d 1234, 1240 (D.C.Cir.1978)). *See also, Superintendent of Insurance v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971) (holding that § 78j "must be read flexibly, not technically and restrictively").

The plaintiffs claim to be sellers of securities within the meaning of Rule 10b–5 by virtue of the December 1997 reverse stock split. The plaintiffs contend that, as owners of less than 400 shares of LINCO common stock, the reverse stock split "operated as a 'sale'" of their shares of stock. Am. Compl. at ¶ 56. The plaintiffs claim that after the reverse stock split, their investment was converted from a share of stock to the right solely to a payment of money.

■ Both parties cite several decisions which generally discuss the "forced sale" doctrine.[11] Originally utilized by the Second Circuit Court of Appeals in *Vine v. Beneficial Finance Co.*, 374 F.2d 627 (2d Cir.1967), the doctrine's use by courts has been confined to a narrow set of circumstances in recent years. *See generally, Broad v. Rockwell Int'l Corp.*, 614 F.2d 418, 436–38 (5th Cir.1980) (discussing the evolution of the "forced sale" doctrine); *Isquith by Isquith v. Caremark Intern., Inc.*, 136 F.3d 531, 535–36 (7th Cir.1998). The general formulation of the doctrine is that "a shareholder should be treated as a seller when the nature of his investment has been fundamentally changed from an interest in a going enterprise into a right solely to a payment of money for his shares." *Dudley v. Southeastern Factor and Finance Corp.*, 446 F.2d 303, 307 (5th Cir.1971).

■ While the "forced sale" doctrine has been criticized and limited by some courts, we believe that the central holding of *Vine* remains relevant: when a shareholder's investment is altered to the point that he or she must choose between liquidating his or her shares in exchange for cash or being completely divested of any interest in the corporation, a "sale" within the meaning of Rule 10b–5 has occurred. When misrepresentations or omissions of material fact are made with scienter "in connection with" such a transaction, Rule 10b–5 has been violated. In this case, the plaintiffs have sufficiently

---

**11.** Neither the United States Supreme Court nor the Sixth Circuit Court of Appeals has determined whether, and under what circumstances, the "forced sale" doctrine may be applied. In fact, there appears to be only one published decision by a district court within the sixth circuit which discusses the issue. *See Matthey v. KDI Corp.*, 699 F.Supp. 135, (S.D.Ohio 1988). In *Matthey*, the court found the doctrine inapplicable to the facts before it. *See id.* at 139–40.

alleged facts upon which a reasonable jury could find that they sold securities within the meaning of Rule 10b–5. The plaintiffs allege that after the reverse stock split was approved, they had no choice but to redeem their scrip. for $0.30 per share. Otherwise, the plaintiffs contend that the scrip would become valueless at the expiration of a limited period of time. We believe that this sort of Hobson's choice is the sort of transaction held by the court in *Vine, supra,* to be a "sale." When considered against the backdrop of the alleged manipulation and inducement on the part of the defendants at the time of the January 1997 LTG tender offer, these facts, as alleged by the plaintiffs, sufficiently state a claim for which relief can be granted under § 78j and Rule 10b–5. Therefore, the defendants' motion to dismiss Count I of the plaintiffs' Amended Complaint will be denied.

### B. Plaintiffs' Rule 13e–3 Claim

 15 U.S.C. § 78m(e)(1) states in relevant part that "[i]t shall be unlawful for an issuer ... to purchase any equity security issued by it if such purchase is in contravention of such rules and regulations as the [S.E.C.] ... may adopt ...." Pursuant to this authority, the S.E.C. adopted 17 C.F.R. § 240.13e–3 ("Rule 13e–3") which prohibits fraudulent conduct "in connection with a Rule 13e–3 transaction ...." Rule 13e–3(b)(1). A "Rule 13e–3 transaction" is defined as:

> any transaction or series of transactions involving one or more of the transactions described in paragraph (a)(3)(i) of this section which has either a reasonable likelihood or a purpose of producing, either directly or indirectly, any of the effects described in paragraph (a)(3)(ii) of this section[.]

Rule 13e–3(a)(3).

The plaintiffs claim that LTG's January 1997 tender offer was "[a] tender offer for

or request or invitation for tenders of any equity security made by the issuer of such class of securities or by an affiliate of such issuer ...." Rule 13e–3(a)(3)(i)(B). The plaintiffs also claim that LTG's January 1997 tender offer had "a reasonable likelihood or a purpose" of "[c]ausing any class of equity securities of the issuer which is subject to section 12(g) or section 15(d) of the Act to be held of record by less than 300 persons[.]" Rule 13e–3(a)(3)(ii)(A).

If a transaction is covered by Rule 13e–3, then the next inquiry is whether, in connection with that transaction, the issuer or its affiliate acted fraudulently. Specifically, Rule 13e–3 states:

> It shall be a fraudulent, deceptive or manipulative act or practice, in connection with a Rule 13e–3 transaction, for an issuer ... or an affiliate of such issuer, directly or indirectly (i) To employ any device, scheme or artifice to defraud any person; (ii) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) To engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Rule 13e–3(b)(1).

 Applying Rule 13e–3 to the case at bar, the plaintiffs must first sufficiently allege that the January 1997 tender offer was a Rule 13e–3 transaction. This requires plaintiffs to make two specific allegations: (1) that LTG was an "affiliate" of LINCO within the meaning of Rule 13e–3; and (2) that LTG's tender offer was either reasonably likely to reduce or had a purpose of reducing the number of LINCO shareholders to less than 300 persons. If

the plaintiffs sufficiently allege that the January 1997 tender offer was a Rule 13e–3 transaction, then their claim will survive the defendants' Motion to Dismiss if it alleges a set of facts on which a reasonable jury could find that the defendants acted fraudulently in connection with the tender offer.[12]

### 1. The January 1997 Tender Offer as a Rule 13e–3 Transaction

#### a. LTG as an Affiliate of LINCO

Rule 13e–3 defines an affiliate as:

[A] person that directly or indirectly through one or more intermediate controls, is controlled by, or is under common control with such issuer. For the purposes of this section only, a person who is not an affiliate of an issuer at the commencement of such person's tender offer for a class of equity securities of such issuer will not be deemed an affiliate of such issuer prior to the stated termination of such tender offer and any extensions thereof[.]

Rule 13e–3(a)(1).

Few courts have addressed the subject of affiliate liability for misrepresentations or omissions made in the context of a tender offer. *See Polar International Brokerage Corp. v. Reeve*, 196 F.R.D. 13, 16 (S.D.N.Y.2000) ("[T]here is a dearth of precedent addressing claims for affiliate liability under § 13(e)."). One court has stated that whether a tender offeror is an affiliate of an issuer turns on either's "ability, directly or indirectly, to direct or cause direction of the management and policies" of the other. *Radol v. Thomas*, 556 F.Supp. 586, 592 (S.D.Ohio 1983), *aff'd*, 772 F.2d 244 (6th Cir.1985).

Another district court recently employed a balancing test in determining the presence of an affiliate-issuer relationship. *See Polar Intern. Brokerage Corp. v. Reeve*, 108 F.Supp.2d 225 (S.D.N.Y.2000). The factors utilized by the *Reeve* court included the "(i) prior relationships between directors of the target company and the acquirer; (ii) whether any director of the target company received compensation from the acquirer (other than through the sale of his or her shares); (iii) whether the acquirer sought to improperly influence the directors of the target company; and (iv) whether the target directors retained positions with the acquirer following the transaction." *Id.* at 246–47 (citations omitted).

As the basis for their Rule 13e–3 claim, the plaintiffs allege that LTG was LINCO's affiliate at the time of the January 1997 tender offer. *See* Am. Compl. at ¶ 65. Specifically, the plaintiffs claim that LTG controlled Sisney, LINCO's majority shareholder, President, and Chairman of the Board of Directors. *Id.* at ¶ 33. This control allegedly existed by virtue of the agreement between Sisney and LTG at the time of the January 1997 tender offer. Pursuant to the agreement, D & D, the corporation which owned approximately 90% of LINCO's voting stock and which was owned entirely by Sisney, would vote its LINCO shares in favor of amending LINCO's Articles of Incorporation. This would give all non-voting shares of LINCO common stock voting rights, a condition of LTG's tender offer. In exchange, LTG allegedly promised to retain Sisney as President of LINCO and to give him an

---

**12.** The sixth circuit has recognized a private under cause of action under Rule 13e–3. *See Howing Co. v. Nationwide Corp.*, 826 F.2d 1470, 1474 (6th Cir.1987). As shareholders to whom a tender offer had been extended, the plaintiffs have standing to bring a claim under the Williams Act. *See Piper v. Chris–Craft Industries, Inc.*, 430 U.S. 1, 35, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977).

option to purchase 50% of LTG's common stock for $10,000 following the successful LTG tender offer. *See* Pls.' Resp. at 27.

Here, the plaintiffs have sufficiently alleged facts on which a jury could conclude that the terms of the tender offer were not the result of arms length negotiations. By allegedly offering Sisney an option to purchase a 50% ownership interest in LTG for $10,000, a price which was clearly a "bargain" by any measure, LTG may have ensured that D & D, LINCO's controlling shareholder, would vote to amend LINCO's Articles of Incorporation. Also, Sisney allegedly retained his control of the operations of LINCO as its president. This additional compensation allegedly paid to Sisney and his alleged retention as president illustrates the type of control which Rule 13e–3 is meant to neutralize. *See Reeve, supra*, 108 F.Supp.2d at 246–47.

The defendants cite *Radol v. Thomas, supra*, and *Woodward & Lothrop, Inc. v. Schnabel*, 593 F.Supp. 1385 (D.D.C.1984), in support of their argument that LTG and LINCO were not affiliated at the commencement of the January 1997 tender offer. However, neither case is persuasive.

In *Radol*, the only evidence of a relationship between the target entity and the tender offeror was a standard merger agreement entered into the day before the commencement of the tender offer. *See Radol*, 556 F.Supp. at 592. The merger agreement contained inconsequential covenants in which the target entity agreed to refrain from extraordinary corporate activity pending the merger. *See id.*

*Woodward & Lothrop* concerned a similar merger agreement signed by the issuer prior to the commencement of the tender offer. In addition, the directors of the target entity were given options to buy stock in the newly merged entity. Finally, the acquiring entity was granted an option to buy shares of the target entity's stock prior to the commencement of the tender offer in order to block competitive offers.

In both cases, the district courts found that the relationship between the offeror and the issuer was insufficient to justify a finding that the offering entity was an affiliate of the issuer.[13] The agreement allegedly at issue here, however, is more indicative of a relationship contemplated by Rule 13e–3. First, the target and the acquiring entity are not alleged to have entered into an agreement concerning the maintenance of normal corporate activities by the target entity as did the parties in both *Radol* and *Woodward & Lothrop*. Rather, the agreement was allegedly entered into between the acquiring entity and the sole shareholder of the corporation which owned approximately 90% of the voting stock of the target entity.

More importantly, Sisney, through D & D's ownership of approximately 90% of LINCO's voting stock, is alleged to have held the key to the success of LTG's tender offer. The plaintiffs claim that without D & D's approval, the LINCO Articles of Incorporation could not be amended, and the tender offer would fail. Realizing this, LTG may have attempted to influence Sisney by offering not only to buy D & D's shares pursuant to the tender offer, but also to compensate Sisney for his support. In *Woodward & Lothrop*, no single shareholder had this extraordinary ability to influence the tender offer. *See Woodward & Lothrop*, 593 F.Supp. at 1400–1401.

**13.** The *Radol* court held as a matter of law that no such relationship existed while the *Woodward & Lothrop* court denied plaintiffs' motion for a preliminary injunction finding that plaintiffs failed to show a " 'likelihood of success' on the merits of their claim[.]" *See Radol*, 556 F.Supp. at 592; *Woodward & Lothrop*, 593 F.Supp. at 1401.

■ Rule 13e–3 ensures that, in a going private transaction, "the terms of the transaction, including the consideration received and other effects upon unaffiliated security holders, [are] determined as a result of arms-length negotiations, [and not] designed to accommodate the interests of the affiliated parties[.]" *Radol v. Thomas,* 534 F.Supp. 1302, 1310–11 (S.D.Ohio 1982) (citing S.E.C. Release 34–17, 719 (1981)). The plaintiffs have sufficiently alleged that the agreement between Sisney and LTG was the type of indirect influence on an issuer by an affiliate which Rule 13e–3 is meant to neutralize. A reasonable jury could find that the terms of the January 1997 tender offer were designed to accommodate the interests of Sisney, not those of all LINCO shareholders.[14] Therefore, we must look to whether going private was either a purpose or a reasonably likely result of the January 1997 tender offer.

### b. Reasonable Likelihood or Purpose of Going Private

■ A tender offer will be subject to the requirements of Rule 13e–3 if it is reasonably likely to cause, or has the purpose of causing, "any class of equity securities of the issuer ... to be held of record by less than 300 persons[.]" Rule 13e–3(a)(3)(ii)(A). Therefore, the plaintiffs must sufficiently allege either that the January 1997 tender offer was intended to cause LINCO shares to be held by less than 300 persons or that it had a reasonable likelihood of causing LINCO shares to be held by less than 300 persons. Because we find that the plaintiffs have sufficiently alleged that the January 1997 tender offer had a reasonable likelihood of

causing LINCO to go private, we need not address the motives behind it.

■ Whether there was a reasonable likelihood of the requisite shareholder reduction is a fact-sensitive inquiry. *See* S.E.C. Release No. 34–14185, *supra,* at *11 ("The [reasonable likelihood] test focuses on the circumstances of the issuer and should be capable of being applied before the transaction."). "[T]he determination of whether a transaction or a series of transactions is likely to produce any of such effects, must take into account past, current, and planned transactions by the issuer, its affiliates and others, as well as other factors which may contribute to the production of such effects." *Maynard Oil Co. v. Deltec Panamerica S.A.,* 630 F.Supp. 502, 506 (S.D.N.Y.1985) (citing S.E.C. Release No. 34–17719, 1981 WL 104125, at n. 18 (Apr. 20, 1981)). Finally, at least one court has held that "conclusory allegations of a 'reasonable likelihood' probably suffice to withstand a motion to dismiss a claim under Rule 13e–3." *Shamrock Associates v. Horizon Corp.,* 632 F.Supp. 566, 572 (S.D.N.Y.1986).

■ The plaintiffs allege that there was a reasonable likelihood of going private based on the terms and conditions of LTG's tender offer. The plaintiffs contend that the January 1997 tender offer by LTG was not limited to a certain number of shareholders. Indeed, the plaintiffs allege that LTG would have accepted as many shares as were tendered by LINCO shareholders in response to the January 1997 tender offer. According to the plaintiffs, the only relevant condition placed upon the offer was that a minimum of 900,000 non-

---

14. We also note that an application of the *Reeve* balancing test would indicate that the January 1997 tender offer was subject to Rule 13e–3. While there is no evidence of a prior personal relationship between Sisney and LTG, at least two other factors of *Reeve* are

alleged by the plaintiffs to be present. First, Sisney allegedly received additional compensation in the form of the option to purchase LTG stock. Second, Sisney allegedly retained his position as president following the tender offer. *See Reeve,* 108 F.Supp.2d at 246–47.

voting shares must have been tendered. *See* Am. Compl. at ¶ 40. We find that the plaintiffs' allegations are sufficient for their Rule 13e–3 claim to survive the defendants' Motion to Dismiss. Without a more complete factual record developed through discovery, we are unable to engage in the inquiry necessary to determine whether there was a reasonable likelihood of going private as a result of the January 1997 tender offer.[15] *Maynard Oil, supra.*

### 2. Defendants' Conduct In Connection With the January 1997 Tender Offer

 Having found that the plaintiffs have sufficiently alleged that the January 1997 tender offer by LTG was a Rule 13e–3 transaction, we must finally determine whether the plaintiffs have alleged conduct on the part of the defendants which, if proven, violates Rule 13e–3. Whereas Rule 10b–5 prohibits fraudulent conduct "in connection with the purchase or sale of any security," Rule 13e–3 proscribes similar conduct "in connection with a Rule 13e–3 transaction . . . ." *Compare* Rule 13e–3(b)(1)(i)–(iii) *with* Rule 10b–5(a)–(c). As discussed above, we have determined that the plaintiffs have sufficiently stated a claim for which relief can be granted under Rule 10b–5. The plaintiffs' Rule 13e–3 claim is based on the same factual allegations which form the basis of the plaintiffs' Rule 10b–5 claim. Having found that the plaintiffs have sufficiently alleged fraudulent conduct on the part of the defendants in connection with the purchase or sale of securities, we have no trouble concluding that the plaintiffs have similarly succeeded with respect to their

Rule 13e–3 claim. For these reasons, we will deny the defendants' motion to dismiss Count II.

### C. Plaintiffs' State Law Claims

#### 1. Dissenters' Rights

 Count IX of the plaintiffs' Amended Complaint alleges that the plaintiffs were entitled to dissent from the resolution authorizing the December 1997 reverse stock split pursuant to Ky.Rev.Stat. Ann. § 271B.13–020. The plaintiffs allege that by failing to advise them of their right to dissent, the defendants violated KRS § 271B.13–200.

KRS § 271B.13–020 states, in relevant part, that:

(1) A shareholder shall be entitled to dissent from, and obtain payment of the fair value of his shares in the event of, any of the following corporate actions:

. . . . .

(d) An amendment of the articles of incorporation that materially and adversely affects rights in respect of a dissenter's shares because it:

. . . . .

4. Reduces the number of shares owned by the shareholder to a fraction of a share if the fractional share so created is to be acquired for cash under KRS § 271B.6–040.

 The plaintiffs contend that the 400–for–1 reverse stock split was a transaction governed by KRS § 271B.13–020 because it had the effect of amending the LINCO articles of incorporation to reduce the number of shares owned by the plain-

---

**15.** The defendants argue that because LINCO lacked current mailing addresses for several hundred shareholders, it would have been impossible for the January 1997 tender offer to reduce the number of shareholders to less than 300. However, the LINCO shareholders who did not receive notice via U.S. mail may have been otherwise notified. On the defendants' Motion to Dismiss, this is an inference it is reasonable for us to indulge. *See Fitzke v. Shappell,* 468 F.2d 1072, 1077 n. 6 (6th Cir.1972).

tiffs to a fractional share which was to be acquired for cash under KRS § 271B.6–040. *See* Am. Compl. at ¶ 92. However, KRS § 271B.6–040, to which KRS § 271B.13–020 refers, makes clear that the term "fractional shares" does not include "scrip." *See* KRS § 271B.6–040(3) ("The holder of a fractional share shall be entitled to exercise the rights of a shareholder .... The holder of scrip shall not be entitled to any of these rights unless the scrip provides for them."). Therefore, it appears that the terms "fractional shares" and "scrip" are, as the defendants argue, mutually exclusive under Kentucky law for the purpose of determining who is entitled to dissent from various transactions.

While we are unable to base this conclusion on any interpretation of these statutes by Kentucky courts, we note that at least one jurisdiction whose statutory scheme is similar to that of Kentucky has made explicit that scripholders, as well as holders of fractional shares, are entitled to dissent from transactions such as the December 1997 reverse stock split. *See* 2000 Colo. Legis. Serv. § 7–113–102 (West). Like Kentucky and Colorado, the majority of states have enacted some version of the Model Business Corporation Act ("MBCA") with minor additions or deletions. *See* Jonathan R. Macey, 2 Macey on Corporation Laws § 14.02[B] (1999). On their face, these statutes indicate that shareholders whose shares are converted to scrip pursuant to a reverse stock split are denied the right to dissent in most jurisdictions. *See, e.g.,* Ala.Code § 10–2B–13.02 (2000); 805 Ill. Comp. Stat. Ann. 5/11.65 (West 2000). Whether this outcome is consistent with the purpose of MBCA § 13.02, upon which KRS § 271B.13.020 is based, is not for this court to decide. *See* Macy, *supra,* at § 14.02[B] ("The purpose of the section is simple in that it merely provides shareholders who may disagree with a particular corporate action, the opportunity to have their shares purchased."). The ultimate determination of whether to afford shareholders whose shares are converted to scrip pursuant to a reverse stock split the right to dissent from the transaction is a decision to be made by the Kentucky General Assembly, not by this court. Therefore, our interpretation of KRS 271B.13–020, when read in conjunction with KRS 271B.6–040, indicates that there is no set of facts upon which a reasonable jury could find that the plaintiffs, whose shares were converted into scrip as opposed to fractional shares, were entitled to dissent from the reverse stock split. Count IX of the plaintiffs' Amended Complaint will be dismissed.

#### 2. KRS § 292.320

In Count V of their Amended Complaint, the plaintiffs allege that the defendants violated KRS § 292.320, Kentucky's Blue Sky Law. Courts within the state of Kentucky, both state and federal, have noted that both the purpose and the language of the Kentucky Blue Sky Law are identical to those of Rule 10b–5. *See Carothers v. Rice,* 633 F.2d 7, 15 (6th Cir.1980); *Boggess v. Commonwealth,* 447 S.W.2d 88, 92 (Ky.1969). Therefore, having found that the plaintiffs have stated a claim for which relief can be granted under Rule 10b–5, we find that the plaintiffs have similarly stated a claim for which relief can be granted under KRS § 292.320. The defendants' motion to dismiss Count V of the plaintiffs' Amended Complaint will be denied.

#### 3. KRS § 271B.8–300, –420

Count III of the plaintiffs' Amended Complaint alleges that Sisney, as an officer of LINCO, violated KRS § 271B.8–420. Count IV of the plaintiffs' Amended Complaint alleges violations of KRS § 271B.8–300 by Sisney, Dolin, and Bar-

horst in their capacities as directors of LINCO. These statutes codify the duties of corporate officers and directors to act in good faith, on an informed basis, and in a manner he honestly believes to be in the best interests of the corporation. *See* KRS § 271B.8–300(1); § 271B.8–420(1).

■ As discussed above, the plaintiffs have sufficiently alleged that the defendants violated state and federal securities statutes. These allegations include claims that the defendants made several material misrepresentations or omissions in connection with the purchase or sale of securities. While the plaintiffs must eventually prove by clear and convincing evidence that these defendants violated the standard of conduct to which directors are held, they need not do so faced with a motion to dismiss for failure to state a claim for which relief can be granted. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (noting that on a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"). Therefore, we find that the plaintiffs' allegations with respect to the defendants' alleged violations of Rule 10b–5 and Rule 13e–3 also sufficiently state a claim under KRS §§ 271B.8–300, –420. The defendants' motion to dismiss Counts III and IV of the plaintiffs' Amended Complaint will be denied.

## CONCLUSION

The defendants' Motion to Dismiss for failure to state a claim for which relief can be granted will be granted with respect to Count IX of the plaintiffs' Amended Complaint. The defendants' motion will be denied with respect to Counts I, II, III, IV, and V, as the plaintiffs have sufficiently alleged facts upon which a reasonable jury could find that the defendants violat-

ed Rule 10b–5, Rule 13e–3, and KRS §§ 271B.8–300, .8–420, and 292.320. Not having been challenged by the defendants' Motion to Dismiss, Counts VI, VII, and VIII of the plaintiffs' Amended Complaint will also survive our ruling. A separate order will be entered this date in accordance with this opinion.